No. 2239
Second Circuit Appeal

## WALTER LAGRONE v. McINTYRE LUMBER CO., INC.

(Feb. 3, 1925, Opinion and Decree.)

*(Syllabus by the Editor.)*

1. **Louisiana Digest—Master and Servant— Par. 158.**

An employee riding on employer's handcar running on employer's tramroad from the corral to a boarding house at the mill run by employer's authority was performing services arising out of and incidental to his employment in the course of his employer's trade business and occupation within the Employer's Liability Act No. 20 of 1914, Section 1, Par. 2.

2. **Louisiana Digest—Master and Servant— Par. 160 (j).**

Where there is no evidence to refute employer's testimony given two weeks after his discharge from the hospital that his leg was stiff and dead, a judgment for compensation for sixty per cent of his previous wages for the period of disability not exceeding three hundred weeks under Employer's Liability Act No. 20 of 1914, Sec. 8, Subsection 1 (a) (as amended by Act 43 of 1922) is correct.

(The recent amendment is Act 216 of 1924. Editor's Note.)

Appeal from the Second District Court of Louisiana, Webster parish, Robert Roberts, Jr., Judge.

This is a suit under Employer's Liability Act No. 20 of 1914, by an injured employee for compensation.

There was judgment for plaintiff and defendant appealed.

Judgment affirmed.

Joel L. Fletcher, of Shreveport, attorney for plaintiff, appellee.

Drew & Drew, of Minden, attorneys for defendant, appellant.

CARVER, J. Plaintiff, a negro laborer, sues his employer, the defendant company, claiming compensation under the work-

men's compensation law (Act No. 20 of 1914 and amendments) for injuries re-received on being thrown where he worked, to defendant's mill, where he boarded.

Defendant denies liability on the alleged ground that at the time of the injury plaintiff was not in its employ, claim-ing that he was employed by the day, and the day's work being finished the employ-ment for that day ceased; that his use of the handcar was unathorized; and that he boarded where he did, at the mill, con-trary to the wishes of defendant company which had provided a boarding place at the corral which he should have used.

The lower court found in favor of the plaintiff, awarding him $9.90 per week, being sixty per cent of his wages, for a period of not over three hundred weeks and defendant appeals.

It it not denied that the injury occurred while plaintiff was riding on defendant's handcar running on defendant's tramroad from defendant's corral to a boarding house at defendant's mill run by defendant's authority.

Defendant claims, though, that it did not authorize the use of the handcar, and that plaintiff should have boarded at the corral boarding house instead of the mill board-ing house.

Plaintiff testified, page 4, that he used the handcar because told to do so by Mr. Cox, defendant's team boss, who was the man that hired him. Mr. Cox does not deny this, testifying, page 26, as follows:

Q. Had you argued with these boys about using this car?

A. Yes, sir.

Q. What did you tell them?

A. I told them from time to time not to run the car so fast; that some of them would get killed; and they did run it as hard as they could every time they left; run it as hard as they could.

Mr. Wheless, president and manager of defendant company testified, page 17 as follows:

Q. Now, Mr. Wheless, did you furnish any mode of transportation for the men to come into the mill?

A. No, sir, we did not, we brought one hand car for the track crew to do the work on the track with, but some of the men that stayed at the mill I presume asked permission to use the hand car; I know they did use it; the section crew might have let them have it for some reason, for convenience the men used it; but that they had no authority from us.

He further states the mill was two and three-eighths miles from the corral.

There is no proof that plaintiff or the other hands were prohibited from using the handcar.

Under this state of facts we think the defendant must be regarded as having at least tactily consented to the use of the handcar.

As to the boarding place, Wheless testi-fied, page 15, that the corral and mill being too far apart to expect the men to walk he provided "a house; all houses that we could secure within a reasonable dis-tance around the camp to be used as tenant houses for our men. Among others, we rented from F. H. Drake through Mr. Cox a large house, about 200 yards from the corral; especially rented it for the boarding house".

He further testified, page 16, he put L. Kennon in it to accommodate the men and that he also arranged a tent with wood floor and four foot wood walls as a sleeping tent for any of the men that would stay there. Further, "the attraction in at the mill was more, so that most of them insisted on going into the mill every night. We did not want them to do it; it was a detriment to our organization as a matter of fact as we wanted them to

stay out there at the work and we did everything we could to induce them to stay there."

He further states that he did not know just how many stayed out at the corral. Subsequently he named six as staying out at the corral, but we do not understand him to mean that they all stayed in the boarding house. These six were: Jerry Turk; Authur Jackson, Arthur Holland, Tom Holland, the foreman, H. W. Cox; and Ralph Cox. He says the two Hollands and the two Coxes were white men; that Arthur Holland had a family, and Tom Holland boarded with him.

He further says that he sent beds out, enough for the entire crew, which beds he afterwards saw, some at Mr. Cox's house and some in the sleeping shack.

Cox testifies, page 28, that L. Kennon kept the tented boarding house but that no one stayed there with him except Jerry Turk and B. T. Rambaud, one of whom had a room in the house and the other boarded, and that the boys that worked out among the teams and logged, boarding some at the mill plant and some at farm houses.

Lucien Walker, a witness for plaintiff, says the mill had two tents and two dwelling houses; that there was no boarding house at the corral; and the tents had harness in them. He says he never heard of a boarding house out there and did not know where Kennon's place was; that the two dwelling houses had white people in them. We suppose these were the Coxes and Hollands.

The plaintiff states, page 4, that the company did not have any place for him to stay out at the corral and that Mr. Cox said he would fix a place out there and would try to do so the next week. He further says:

Q. Out where you work?

A. Yes, sir, I told him I did not care to be riding the handcar and asked him to fix a place to stay and he said that he would try and get it ready next week.

Cox does not deny this.

Plaintiff says, page 30, that he did not know of any boarding house out at the corral nor did any one ever tell him there was one there. Also, that he did not know where L. Kennon lived and did not know Kennon.

Under this state of the evidence, we think that the wish of the defendant company that plaintiff and the other woods workmen should stay at the corral was at most a mere preference that they should do so and that there was no prohibition against their boarding at the mill boarding house. We do not mean, though, to intimate, that, if the fact were otherwise, it would make any difference. Even if there had been a prohibition against plaintiff's boarding at the mill; as long as he did so to the knowledge of defendant and used means of transportation belonging to it with its implied consent, defendant could base no plea on this ground; and it is by no means certain that it could do so in any event.

Defendant contends that the employment being by the day, with the privilege to plaintiff to draw his wages every day, the employment ceased each day on the plaintiff's finishing work for that day; or, in other words, the case must be considered as though he was employed every morning just for that day. We do not think this sound. Plaintiff testified he had been working there about two months and defendant's manager said the company paid off twice a month. There was no pretence that plaintiff did draw his wages every day or that he was formally engaged every morning and discharged every evening.

Defendant's counsel does not cite us to any authorities.

We think the case falls within the principle of Provost vs. Gheens Realty Co., 151 La. 508, 92 South. 38, cited by plaintiff's counsel, the syllabus of which reads as follows:

"An employee going from his work to his lodging house on the employer's premises, where he had the privilege of sleeping as a part of the compensation for his work, was performing services arising out of and incidental to his employment in the course of his employers trade, business, and occupation, within the Employer's Liability Act, Section 1, par. 2."

It is true that in this case the plaintiff in sleeping at the boarding house at the mill was not doing so as a privilege forming part of his compensation, but we do not think this circumstance sufficient to take the plaintiff's case out of the principle of the decision.

See, also Myers vs. La. Ry. & Nav. Co., 140 La. 937; 74 South. 256, in which various cases are listed construing the phrase "out of and in the course of employment".

As to the extent of the injury, Dr. Lambert testified, page 4, that plaintiff had a complete fracture of the femur of the left leg; that this leg was placed in a Buck Extension Apparatus with sandbags on either side and that he was kept in this position for about three weeks, when a plaster cast was put on and he was discharged with directions to return in four weeks for removal of the cast. He was first admitted to the hospital (Charity Hospital, at Shreveport) March 28, 1924; discharged, April 30, 1924; readmitted May 26, 1924, and discharged the second time June 9, 1924, at which time Dr. Caldwell regarded the case as cured. Dr. Caldwell does not testify.

Plaintiff testifies, page 6, as follows:

Q. Well, after you were hurt, how badly were you hurt, how were you hurt?

A. Well the handcar was wrecked and I was on the back end, four of us on the car, when it wrecked and turned off and threw me in front and this leg hit across the rail and I was on my stomach.

Q. Your left leg?

A. Yes, sir.

Q. Had your left leg injured?

A. Yes, sir, and bruised my back and I fell and bounced back and knocked my hip out of place.

Q. Wsa there any break or fracture of the leg?

A. Broke my leg here; knocked it out of place here; my hip.

Q. How long did they keep you in the Hospital?

A. I was kept there twenty six days with the weights and they took that off and put a cement cast on the leg, all over it, jacket around my body; big jacket so I could not move it; lay flat on my back for six weeks and took it off and my leg was dead, never came to life yet. (He was testifying June 23, 1924.)

Q. Is your leg dead yet?

A. Yes, sir, it is stiff, never came to life.

Q. How old a man are you?

A. Forty years old on the sixth of September.

Q. Can you do any other kind of work except manual labor?

A. No, sir, never done anything but hard work.

No effort was made to prove that plaintiff's leg was not stiff or dead, nor was it shown what, if any, work he has done since the injury. Neither is there any evidence as to what, if any, he could have done or could do hereafter.

The plaintiff testified, and there was no contradiction, that his wages were $2.75 per day. The District Judge gave judgment for $9.90 a week for not exceeding three hundred weeks, this being equal to sixty per

·cent of this wages. Evidently he ·regarded the injury as coming under subsection (a) of clause 1, of· Section 8 of the compensa-·tio nlaw (Act No. 20 of 1914, page 44, as amended by Act No. ·43 of 1922, page 74) reading as follows:

"For injury producing temporary total disability to do work of any reasonable ·character, sixty per centum of wages during the period of disability, not, however, beyond three hundred weeks."

Defendant· contends that the term for which allowance, if any, should be made, should not exceed twelve weeks because of the testimony of Dr. Lambert₊ introduced by plaintiff, that about that time plaintiff was discharged as cured.

There was no attempt, though, to refute plaintiff's testimony given two weeks after his discharge from the hospital. that his leg was stiff and dead.

, We do not think the judge erred in deciding that the disability had not terminated and that during its continuance but not over three hundred weeks, he was entitled to compensation.

The judgment of the lower court is affirmed.