78 So.2d 225 (1955)
Mrs. Shirley G. ROSENQUIST
v.
NEW AMSTERDAM CASUALTY COMPANY.
No. 20508.
Court of Appeal of Louisiana, Orleans.
January 31, 1955.
Rehearing Denied March 14, 1955.
*226 James G. Schillin, New Orleans, for plaintiff and appellee.
Henriques & Mayo, New Orleans, for defendant and appellant.
McBRIDE, Judge.
Mrs. Shirley G. Rosenquist, claiming to have been rendered totally and permanently disabled by an accident which occurred on August 4, 1951, brings this suit under the Workmen's Compensation Statute for 400 weeks' compensation at the rate of $30 per week, subject to a credit for compensation already paid, and $500 for medical expenses incurred or to be incurred. Plaintiff's claim for $1,200 for her attorney's fee *227 has apparently been abandoned. At the time of the alleged accident plaintiff was the employee of Maison Blanche Company, and the suit is directed at the compensation insurance carrier for the said employer.
Plaintiff's occupation was combination saleslady and beauty operator on board the S.S. Del Mar (owned and operated by the Mississippi Shipping Company), which makes regular voyages for the carriage of freight and passengers between New Orleans and South American ports. Maison Blanche Company held a concession to sell its merchandise and operate a beauty parlor aboard the vessel, and plaintiff was employed by Maison Blanche Company to take charge of operating the concession.
Approximately at 3 o'clock p.m. on the date in question, Mrs. Rosenquist, garbed in a bathing suit and sandals, was on the sun deck of the vessel reclining on a pad. The Del Mar was then en route from Rio de Janeiro approximately ten days out of New Orleans. Plaintiff testified that the ship was rolling and there may have been a salt spray on deck, the surface of which was of slick steel possessing no treads of any kind. Her statement is that as she endeavored to rise from her recumbent position, the roll of the ship caused her to slip and fall. The injuries received in the fall, she claims, have rendered her totally and permanently disabled.
Mrs. Rosenquist earned a base wage of $35 per week, plus commissions on sales of merchandise averaging about $150 per month. Also, her transportation and living expenses on board of the vessel, as well as hotel and other expenses when in port in South America, were paid by Maison Blanche Company. Mrs. Rosenquist began working on the ship during the year 1949; she had been specially trained for the job at the store of Maison Blanche in New Orleans. Her duties were to sell merchandise and operate the beauty shop; she had no regular hours of work and was subject to call at any and all times whenever passengers desired to purchase merchandise, and her job was to accommodate them, even in the night time, after the shop had been closed. While in port in South America, plaintiff was also on duty as she sought orders from persons there for the goods sold by her employer. She was privileged to purchase from Maison Blanche Company at a discount rate her own clothing, which she wore both on board the ship and in South America in order show them off, the idea being to create a desire in others for such merchandise as her employer dealt in.
It was the understanding that while aboard the Del Mar, Mrs. Rosenquist was to have the same privileges as any passenger and could use all of the facilities on the vessel to the same extent as though she had been a fare-paying passenger.
The defendant raises several defenses; it is contended that plaintiff was not engaged in a hazardous employment; that she was not acting within the scope of her employment when the accident occurred; that the accident did not arise out of or in the course of the employment; that plaintiff suffered only a dislocated kneecap, which injury was treated by her own physician who discharged her as cured on January 2, 1952, whereupon she returned to her employment; that plaintiff was paid her wages in full through November 7, 1951, and is entitled to no further compensation.
Ultimately judgment was rendered in favor of plaintiff for workmen's compensation for a period not to exceed 400 weeks at a weekly rate of $30, subject to a credit of 78 weeks already paid. Plaintiff also was awarded $391 for medical expenses and the right was reserved to her to claim future medical expenses; the witness' fee of Dr. E. H. Maurer, who appeared as an expert for plaintiff, was fixed at $50.
Defendant appeals and plaintiff has answered the appeal praying that the allowance for medical expenses be increased to $1,000 so as to cover not only the expenses already incurred but those that might be incurred in the future; appellee also prays that Dr. Maurer's expert fee be increased to $100 and that an expert witness' fee in the same amount be allowed to Dr. Joel B. Gray.
*228 Hence, we are confronted first with the proposition whether the business of retail store and beauty shop aboard a vessel plying the high seas and operating between two continents is such a hazardous business as to come within the operation of the Workmen's Compensation Law. LSA-R.S. 23:1035 provides that Chapter 10 of the Statutes, which composes the Workmen's Compensation Law of this State, shall apply to every person performing services arising out of and incidental to his employment in the course of certain of the employer's trades, businesses and occupations which are specifically designated. No mention is made in the designation of the business of retail store or beauty shop; however, the provision is made in LSA-R.S. 23:1035 that if there be or arise any hazardous trade, business or occupation or work other than those enumerated, it shall come under the provisions of the Act.
We agree with defendant's counsel that it has been held that a retail mercantile business is not hazardous per se, but in the cases in which that was the holding the business referred to was not a retail mercantile establishment conducted by the employer on board of an ocean-going steamship. We also agree that the department store operated by Maison Blanche Company on Canal Street in New Orleans might not be considered to be hazardous, but we cannot say the same thing for that part of the business which Maison Blanche operates and conducts as concessionaire on board the Del Mar; that portion of its business can be considered in no other light than hazardous. A business may consist of several departments of which some are hazardous per se or made so by law, while others are clearly nonhazardous, and an employee whose duty requires him to perform services in both hazardous and nonhazardous departments and who is injured while performing those services may recover compensation. See Collins v. Spielman, 200 La. 586, 8 So.2d 608; Stephens, for Use and Benefit of Stephens v. Catalano, La.App., 7 So.2d 380; Staples v. Henderson Jersey Farms, Inc., La.App., 181 So. 48; Crews v. Levitan Smart Shops, Inc., La.App., 171 So. 608.
In Brownfield v. Southern Amusement Co., Inc., 196 La. 73, 198 So. 656, it was held that in applying the provisions of the Workmen's Compensation Statute to cases where employees are injured in a business not specifically mentioned as being hazardous, the inquiry must be whether the duties of the injured employee required him to perform services of a hazardous nature incidental to his employment and directly associated with the employer's business.
Surely, it cannot reasonably be said that Mrs. Rosenquist, in carrying out the duties of her occupation, did not assume much greater risks than a saleslady would be exposed to if employed by Maison Blanche Company in its department store in New Orleans. The plaintiff in undertaking her duties was exposed to all the perils of the sea, which, to say the least, are considerable and real; for instance, the record shows that on one occasion the Del Mar came into collision with another vessel, and at another time the ship ran aground. Those two specific perils, as well as numerous others, confronted the plaintiff each time her employment necessitated her making a voyage.
The settled jurisprudence is that an employer who operates motor-driven vehicles, even though his principal business be not hazardous, is to be considered as engaged in a hazardous business in workmen's compensation cases, and any employee whose duties bring him in contact with motor-driven vehicles is protected by the workmen's compensation law. This being so, we can think of no reason why a business conducted on an ocean-going vessel should not be held to be hazardous and why an employee engaged in conducting such business for the employer is to be denied the benefits of the compensation statute. To our minds, the hazards to be encountered by one called upon to work on board a ship propelled by steam are fully as great as those to which an employee is exposed in connection with the operation of motor vehicles.
*229 Under the specific terms of LSA-R.S. 23:1035, the operation of vessels, boats, and other water craft constitutes a business which is hazardous per se, and under that provision had the retail sales establishment and the beauty shop been operated by the owner of the vessel instead of a concessionaire, there could be no denial that the claim of plaintiff would come squarely within the provisions of the Statute. Accordingly, we do not see how it can be reasoned that Mrs. Rosenquist, merely because here employer, Maison Blanche Company, and not the owner of the vessel, operated the business on shipboard cannot assert a claim for compensation.
Defendant insists that the plaintiff when the accident occurred was not performing services arising out of and incidental to her employment in the course of the business of Maison Blanche Company, the contention being that she was in a place where she had no right to be.
Under the conditions of the employment, plaintiff must be considered as having been engaged in the duties of her occupation throughout the voyage. Thus, due to the peculiar location of the business of Maison Blanche Company in which plaintiff was employed, the whole of the vessel on which Mrs. Rosenquist was required to live, in effect, may be said to be the "premises" of her employer.
In Kern v. Southport Mill, 174 La. 432, 141 So. 19, 20, the plaintiff, employed as a pipe fitter, was directed to do some outside work and then return to the mill. On returning, he stepped out of a streetcar into the path of an automobile, was struck down and injured. He filed suit for workmen's compensation and recovered a judgment. The first question propounded by the case was whether plaintiff's injuries were sustained whilst he was "`performing services arising out of and incidental to his employment in the course of his employer's trade, business or occupation'". In answering the question the Court said:
"Now an accident occurs in the course of an employment when it takes place during the time of such employment; just as a happening occurs in the course of any given day when it takes place during that day. Hence the provision that the accident, to entitle the employee to compensation, must occur in the course of his employment, means nothing more than that it must have taken place during the hours of employment and not at any other time.
* * * * * *
"But that alone is not enough for recovery; the statute further requires that the accident must also `arise out of' the employment. By which is meant, that the accident must be the result of some risk to which the employee is subjected in the course of his employment and to which he would not have been subjected had he not been so employed."
The Court then gave this interesting illustration:
"But time, place, and circumstance must determine this. When the ill-fated Titanic foundered in the spring of 1912, all persons aboard her were situated exactly alike as to time and place; but they were not all situated alike as to circumstances. Those who traveled for pleasure were present of their own free choice alone; those who traveled for business, whether their own or that of another, were there of necessity. And, when one finds himself at the scene of accident, not because he voluntarily appeared there but because the necessities of his business called him there, the injuries he may suffer by reason of such accident `arise out of' the necessity which brought him there, and hence `arise out of' his employment, if it so be that he was employed and his employment required him to be at the place of the accident at the time when the accident occurred."
And then it was said:
"In determining, therefore, whether an accident `arose out of' the employment, *230 it is necessary to consider only this: (1) Was the employee then engaged about his employer's business and not merely pursuing his own business or pleasure; and (2) did the necessities of that employer's business reasonably require that the employee be at the place of the accident at the time the accident occurred?
"The question whether or not the employee might have been injured in the same way, and even at the same place and time had he not been called there by the necessities of his employer's business, but had gone there only for his own pleasure or in pursuit of his own business, has nothing whatever to do with the case. It was his employer's business which called him to the place and time of the accident and not his own pleasure or business; and hence his injuries arose out of his pursuit of his employer's business and not out of his pursuit of his own business or pleasure."
In Prevost v. Gheens Realty Co., 151 La. 508, 92 So. 38, 40, the Court said:
"* * * When an employee is going from his work to his lodging house, on the premises where he works, he is, within the meaning of paragraph 2 of section 1 of the Employers' Liability Act, `performing services arising out of and incidental to his employment in the course of his employer's trade, business or occupation.' See authorities cited in Myers v. Louisiana Railway & Navigation Co., 140 La. [937] 938, 74 So. 256."
In the unreported case of Primus v. C. C. Hartwell Co., Orleans No. 9172 of our docket (Opinion Book 64), See Louisiana Digest, an employee who had "knocked off" for lunch, but who was subject to call during his lunch hour by other employees of the company, was injured and the question was whether the employee when injured was rendering services arising out of and incidental to his employment in the course of his employer's business. In a syllabus our predecessors said:
"The `lunch hour' which intervenes between the periods of actual employment and which is devoted to necessary rest and refreshment, cannot be held to interrupt an employee's performance of `services arising out of and incidental to his employment in the course of his employer's trade, business or occupation.' On the contrary, it is proper and in consonance with the spirit of the Act to hold that the employment is continuous during such hour, provided the employee has not traveled unreasonably from the course of such employment."
The Court of Appeal for the Second Circuit was of the opinion that Lagrone v. McIntyre Lumber Co., 1 La.App. 564, fell within the principle of Prevost v. Gheens Realty Co., supra, and held that an employee riding on his employer's handcar on the employer's tramroad from a corral to a boarding house at the mill run by the employer's authority was performing services arising out of and incidental to his employment in the course of his employer's trade, business and occupation within the terms of the Statute.
In St. Alexandre v. Texas Co., La.App., 28 So.2d 385, an injury was sustained by an employee during his hours of employment when a beverage bottle broke when he was attempting to open it and he cut his hand. We held that the injury arose out of and in the course of the employment so as to be compensable, although the employer did not furnish the beverages but recognized and approved the practice of the employees providing themselves with cold drinks.
It seems to us that Mrs. Rosenquist when injured was situated no differently from the pipe fitter who was struck by the automobile upon returning from the outside work or the workman who was injured while sleeping on the employer's premises, or the workman who was injured during the interval of his lunch hour, or the workman who was hurt on the handcar riding to his lodging quarters on the employer's premises, or the workman who *231 was injured by the exploding beverage bottle. Because the facts show that plaintiff was relaxing on the sun deck when injured is no reason for a holding that she was not performing services during the course of and arising out of and incidental to her employment. She clearly comes within the terms of the Act, and if she sustained a disabling injury in the fall on the sun deck, it is compensable.
Plaintiff, who is 29 years of age, testified that as a result of the fall she struck her right knee and back and received a "knot" at the base of her skull. Being unable to walk, she was carried to the operating room and there it was found that her knee joint was dislocated, and at the request of the ship's doctor, a Dr. Parrero of Venezuela, who chanced to be a passenger on the Del Mar, reduced the dislocation. Plaintiff says she also complained of the knot at the base of her skull, of severe headaches, and also of pain in her back, but the doctors paid no attention to these complaints. The next day the ship's doctor removed the bandage which Dr. Parrero had applied and told plaintiff to make an attempt at moving about. She says her leg was swollen and she experienced pain in the back; she could not bend her leg and for ten days on the way to New Orleans she received no medical treatment whatsoever. Plaintiff stated she was unable to carry out her duties.
On the morning of her arrival in New Orleans, plaintiff left the boat with the aid of a broomstick, was met by Mr. Cole, claim adjuster for Mississippi Shipping Company, and taken to Baptist Hospital where X-rays of her leg were made, after which she proceeded to her home. She claims that up until 8:00 that night she received no word as to what the X-rays disclosed, so she called Mr. Herbert Kenny, her superior at Maison Blanche Company, who she says advised her to get medical treatment immediately wherever she could get it.
Mrs. Rosenquist thereupon went to Touro Infirmary and asked to see Dr. Prieto, who was not available, so she was referred to Dr. Mellinger, who in turn called Dr. Irving Redler in whose care plaintiff placed herself.
Dr. Redler, an orthopedic surgeon, who appeared at the trial as a defense witness, treated plaintiff from August 12, 1951, to January 2, 1952. Her complaint was that she had injured her right knee which caused pain and disability. After an examination, Dr. Redler applied a plaster of paris cast to the leg which remained in place for three weeks, and after its removal plaintiff was given exercises and physical therapy in an effort to gain the motion back in the knee and strengthen the muscles.
Dr. Redler also treated plaintiff for a back condition from October 20 into the month of December. He found that there was tenderness on pressure over the lumbosacral joint and over the sacrum itself.
On January 2, 1952, Dr. Redler believed plaintiff required no further medical attention so he discharged her and thought she was able to return to work. The doctor did state, however, that there was still some weakness in the big muscle on the front of the thigh, which condition he felt would improve with time and that the eventual result would be satisfactory.
After Dr. Redler's discharge, Mrs. Rosenquist claimed that her leg still remained stiff and sore and that her back pained her, but that notwithstanding these conditions, by arrangement with Mr. Kenny, she returned to work and made several trips on the Del Mar as the employee of Maison Blanche, as the employee of Mississippi Shipping Company, and also as the employee of Shops at Sea, the latter having succeeded Maison Blanche as the concessionaire, but she was forced to quit the job in order to obtain more medical treatment. She insisted that she did not have the physical ability to continue on with her work.
According to plaintiff, after quitting the job she called upon Dr. Joel B. Gray, a general practitioner, who first saw and examined her on May 12, 1953. Plaintiff was *232 still under treatment by Dr. Gray on the date of the trial below and had been seen and treated by him on thirty-one occasions. It was the opinion of Dr. Gray that Mrs. Rosenquist suffered from coccydynia, which is the medical term for pain about the coccyx, and also from a traumatic neurosis, which conditions Dr. Gray said very likely were caused by the injuries sustained in the fall on the Del Mar. Dr. Gray meticulously outlined his course of treatment and stated his belief was that plaintiff was totally disabled and would require further medical attention. He said she definitely had a case of traumatic neurosis. Her entire nervous system was aggravated; she was fatigued and "worn out" and generally felt bad.
The plaintiff also was examined by Dr. Emile Bloch, a general practitioner and the physician for Maison Blanche Company. Dr. Bloch first saw her on December 31, 1951, while Mrs. Rosenquist was undergoing treatment from Dr. Redler. Dr. Bloch stated she then complained of pain in the knee and a lump in the posterior cervical region, but he could find nothing at all wrong with the patient. On the second examination, which took place on February 4, 1952, Dr. Bloch still could could see nothing wrong. He conceded that he never placed his hands on plaintiff and all findings by him were purely clinical. What that means he never explained. He himself said: "I don't like to qualify here as an expert witness."
Dr. Edward H. Maurer, an orthopedic specialist, appeared for plaintiff as a witness and testified that on two occasions he examined her, first on May 27, 1952, and at that time Mrs. Rosenquist complained of pain in both posterior inferior iliac spines and of acute pain at the sacrococcygeal angle. Pressure of the coccyx produced pain and he termed this condition coccydynia. He said coccydynia could persist for an indefinite period and that if such condition did persist it usually caused a neurosis. Dr. Maurer's second examination was on December 15, 1952; this time, besides complaining about her coccyx, Mrs. Rosenquist also complained of pains in the shoulder. Dr. Maurer attached no particular significance to the shoulder pains, but as to the other he attributed that to the coccydynia which he had found on his initial examination. This condition, in his opinion, could very well have been caused by trauma. He believed Mrs. Rosenquist to be totally disabled from carrying on her work.
Dr. Irvin Cahen, who specializes in orthopedics, appeared as an expert witness for defendant. He examined plaintiff on December 8, 1953, while Mrs. Rosenquist was the patient of Dr. Gray, and he testified that from the patient's history he could believe that the condition of her knee and her back had been the result of contusion. But his opinion was that from the date of the accident to the time of his examination orthopedic evidence of the injuries had apparently cleared and he could find no disability whatever.
Defendant, while admitting the accident, denies what plaintiff claims the result thereof to be. Counsel in support of the denial point out that upon being discharged by Dr. Redler on January 2, 1952, Mrs. Rosenquist returned to work on the Del Mar and remained to April 30, 1953, when she quit. The argument is made that if she could perform her duties for the period of more than a year, such fact demonstrates positively that she labored under no disability. Counsel maintain that during that period plaintiff did not even complain of pain, was capable of doing her work satisfactorily, and did not see fit to seek further medical treatment. Plaintiff testified, and we have no reason to doubt what she said, that she only made the effort to work because she had no independent means or income and depended solely on her earnings. We also believe that she labored under a physical handicap and suffered from the pains in the lower back which ultimately forced her to seek the services of Dr. Gray.
Defendant's counsel both in argument and brief stress that Mrs. Rosenquist made no report of a back injury to any one until after Dr. Redler had removed the cast from her leg which was some three weeks after her return to New Orleans. Plaintiff *233 does not agree that she did not complain sooner and maintains that she told Dr. Redler of the injury the first time she saw him. But even accepting what Dr. Redler had to say about when the complaint was made, we do not believe that a failure on the part of plaintiff to complain sooner would militate against her for a reason which cannot escape notice, and that reason is that Dr. Redler did actually find a back injury which he treated from October 20 to some time in December.
We attach no importance to the statement purportedly made on shipboard by Mrs. Rosenquist that "I lost my balance and struck my right knee against the deck steel floor," as it may be that whoever made out the report might have been in error as to what the plaintiff said.
The trial judge was impressed by the testimony of Drs. Maurer and Gray and concluded that plaintiff was totally and permanently disabled, and there is nothing in the record which would cause us to disagree with him. To hold for defendant would mean only this: that what Drs. Maurer and Gray had to say would have to be brushed aside and the opinion of Dr. Cahen accepted instead.
Of course, Dr. Redler, on January 2, 1952, saw only a slight residual in the leg which he thought would dissipate itself within a short time within a normal course, but it occurs to us that it could well be that the conditions of which plaintiff now complains might have developed after the last date Dr. Redler saw her. Plaintiff actually had some trouble with her back else Dr. Redler would not have treated her for a back condition.
We readily believe that Mrs. Rosenquist has the neurosis at present; this condition was prophesied by Dr. Maurer if the coccydynia persisted. Considerable weight must be given to Dr. Gray's testimony when he says he believes plaintiff has the coccydynia and a traumatic neurosis. Being acquainted with plaintiff through long personal contact, we think this physician is in the better position to testify as to the nature of her complaints and disabilities than a physician who merely makes an examination for the purpose of testifying on the trial of the case. See Vienne v. Chalona, La.App., 28 So.2d 154.
The trial judge allowed defendant credit for 78 weeks' compensation; this not only represents the number of weeks for which compensation was actually paid but also includes the number of weeks plaintiff worked after leaving Dr. Redler's care. The award of $391 for medical expenses is correct. Plaintiff seeks an increase in the amount to $1,000 so as to cover future medical expenses, the amount of which, to say the least, is purely conjectural. Nowhere in the Workmen's Compensation Statute is it provided that an injured workman may recover an arbitrary amount for future medical expenses, and, therefore, the reservation of plaintiff's right to claim in the future whatever other medical expenses she might incur in the treatment of her injuries was quite proper. Boykin v. We Hope Gas & Oil Co., La.App., 2 So.2d 528.
The expert witness' fee of $50 allowed to Dr. Maurer for his appearance as a witness should be increased to the extent prayed for by plaintiff in the answer to the appeal. We believe $100 to be reasonable under the circumstances. But we cannot allow an expert's fee to Dr. Gray because whatever testimony he gave was limited almost exclusively to the disclosure of facts concerning his treatment of plaintiff and her condition; in other words, he testified to facts which were within his knowledge as the plaintiff's attending physician. Cutitto v. Metropolitan Life Ins. Co., La.App., 172 So. 812.
The judgment appealed from is amended so as to increase the expert witness' fee of Dr. Edward H. Maurer to $100, and as thus amended and in all other respects it is affirmed.
Amended and affirmed.