94 So.2d 478 (1957)
Lucille M. SEALS
v.
The CITY OF BATON ROUGE.
No. 4366.
Court of Appeal of Louisiana, First Circuit.
March 25, 1957.
Rehearing Denied May 2, 1957.
Writ of Certiorari Denied June 28, 1957.
*479 R. Gordon Kean, Jr., John V. Parker, Baton Rouge, for appellant.
L. C. Parker, H. D. Copenhaver, Jr., Baton Rouge, for appellee.
LOTTINGER, Judge.
This matter is before us on an appeal taken by the City of Baton Rouge from a judgment rendered against it in the Court below. The trial judge rendered written reasons for judgment which we herewith set out in full:
"Plaintiff brings this suit against the City of Baton Rouge, seeking to recover under the Workmen's Compensation Law for the death of her husband, Ernest Seals, a captain on the police force of the City at the date of his death, January 21, 1955. Recovery is sought for plaintiff as surviving spouse of decedent and for two sons, issue of her marriage to decedent, both under the age of eighteen years on the date of the death of Captain Seals. Plaintiff alleges that her husband died of coronary thrombosis following the aggravation of a pre-existing heart condition caused by the demands of the officials of the police department in their efforts to compel him to retire.
"Exceptions of no cause and no right of action were filed by defendant and by the court overruled. These exceptions are here renewed.
"The only testimony heard by the court was that of Dr. Howard B. Witter, decedent's family physician since 1932, called as a witness for plaintiff. The deposition of plaintiff, taken a few days before the trial, was offered in evidence by agreement of the parties. The other evidence was offered by joint stipulation of the parties, and consists largely of documentary evidence.
"Captain Seals became a member of the City Police force on July 1, 1934, and except for the period from October 1, 1937 to May 14, 1938, he served therein until his death. On October 1, 1951, he suffered an attack of coronary thrombosis and was under the care of Dr. Witter who discharged him as able to resume his active duties as a police captain on August 1, 1952. So far as the record shows Captain Seals performed these active duties without interruption *480 for almost two and one-half years, or until he suffered an attack of anginal pains on January 17, 1955, followed by a second and fatal attack of coronary thrombosis on January 21, 1955.
"Dr. Witter was the decedent's personal physician for a period of about twenty-three years, commencing some two years prior to decedent's becoming a member of the City Policy Force. He was intimately acquainted with decedent, saw him frequently, and gave him such medical attention as was required. The doctor testified that throughout these years Captain Seals had no serious illness other than the heart attacks mentioned. He further testified that when he discharged Captain Seals as able to resume his duties on August 1, 1952, the captain had made a normal recovery from his heart attack on October 1, 1951 and was fully able to perform his duties in directing and supervising the work of the police officers under his command. As already stated, there is nothing in the record which shows the doctor was mistaken in this opinion. He did testify, as would be expected, that he ordered Captain Seals to avoid strenuous physical activities.
"Three or four days prior to January 17, 1955, Dr. Witter learned of the demands being made on Captain Seals that he retire. His first information on this question came from Mrs. Seals. Following this, Captain Seals discussed the matter with the doctor. Dr. Witter testified that on this occasion Captain Seals was greatly upset and was obviously undergoing severe mental agitation and worry. He insisted that Captain Seals get away from his work and the local surroundings for a time and endeavor to cease worrying, or the results would be serious. Three or four days later on January 17, 1955, after Captain Seals had begun a short vacation from his active duties, he had this attack of anginal pains for which Dr. Witter treated him and from which he made a good recovery. It appears that between January 17 and January 21, 1955, Captain Seals visited his father in Franklinton, leaving Baton Rouge on the morning of the 18th and returning on the evening of the 20th. He suffered the fatal attack at his home on January 21, 1955, and died enroute to the hospital.
"Without further review of Dr. Witter's testimony it suffices to say he testified positively and unequivocally that mental agitation and worry over the probability of his forced retirement was the sole cause of Captain Seals' fatal heart attack. His testimony on that point is not contradicted to the slightest extent, and there does not appear to be any dispute about the matter.
"Dr. Witter's qualifications as a medical expert, his integrity, and his professional standing and reputation are unquestioned. This Court accepts his testimony as conclusive.
"The facts relative to the probable forced retirement of Captain Seals are reflected by certain documents filed in evidence in connection with the joint stipulations of the parties.
"For the year 1954 the city budgeted $3,000 to the police department for `Physical Capacities Analysis.' This work was under the direction of Dr. Charles McVea, an eminent physical and surgeon of Baton Rouge. Prior to October 15, 1954, physical examinations were made by Dr. McVea or under his direction of a large number, possibly all, of the members of the police department, including Captain Seals. The actual physical examination of Captain Seals was made by Dr. Louis Mayer, an associate of Dr. McVea's and likewise an eminent physician and surgeon. Based on Dr. Mayer's examination, Dr. McVea reported *481 to Shirley S. Arrighi, Chief of Police, that `Captain Ernest Seals had a coronary thrombosis 3 years ago and was referred to Dr. Eugene Toups for investigation. He is not fit for duty except to do desk work.' This report with recommendations, along with reports and recommendations relative to various other members of the police department, was embodied in a letter of the Chief of Police to the mayor and city council under date of October 15, 1954. The chief called attention to the fact that Captain Seals had just completed twenty years of service and was eligible for retirement. He recommended that Captain Seals be given a disability pension.
"It is stipulated that Captain Seals was receiving a salary of $400 per month, and that his retirement benefits or disability pension, whichever it might be called, would be $200 per month.
"It is stipulated by the parties that if Chief Arrighi had been called as a witness he would have testified that he did not single Captain Seals out with demands for retirement. However, plaintiff declined to admit the correctness of such testimony.
"At a meeting of the City Council on December 29, 1954, the question of the admitted actuarial unsoundness of the police pension system was discussed and steps were outlined looking toward some remedy for this situation. The minutes of this meeting indicate that the members of the police department were aware of the unsoundness of their pension system, and since Captain Seals was one of the high ranking officers of the department, it is reasonable to assume he was aware of it.
"At the council meeting of December 29, 1954, a resolution was offered to provide funds to defray the additional cost of disability retirements recommended by the chief in his letter of October 15, 1954. This resolution was laid over for action on January 12, 1955.
"Under date of December, 30, 1954, the police civil service board forwarded a letter to Captain Seals which shows that he fell short of having twenty years service with the police department.
"At this state of the proceedings, under date of January 3, 1955, the Chief of Police forwarded to Captain Seals a letter reading as follows:
"`In connection with your physical examination performed under the Physical Capacities Analysis program, it has been recommended that you be allowed to request your disability pension in accordance with the regulations of the Municipal Fire and Police Civil Service Board and the policy of the City of Baton Rouge. All personnel in the Police Department shall be physically fit at all times to perform the duties assigned them.
"`If a request for disability pension is not received within a reasonable length of time, that is by January 15, 1955, it will be my duty to call your disability to the attention of the Civil Service Board for action.'
"On January 12, 1955, the city council adopted the resolution introduced on December 29, 1954, wherein it assured the trustees of the police pension fund that it would make available, as required, additional funds to defray the cost of the disability retirements in question.
"In my opinion this court is not called upon to determine whether the city authorities had the legal right to force Captain Seals to retire, nor to determine whether he was physically able to perform the duties of a police captain. Since the cause of his death *482 has been established, it is necessary to determine whether this cause of his death was an accident arising out of and in the course of his employment.
"From the evidence it readily appears that the one single occurrence which was the direct cause of decedent's fatal heart attack was his receipt of the letter addressed to him by the chief of police under date of January 3, 1955, which letter is quoted in full hereinabove. The other related occurrences formed the background for the letter, but it was the letter itself which carried the tone of finality. If we have an accident here in the contemplation of the statute it is decedent's receipt of this letter on or about January 3, 1955, and not his heart attack of January 21, 1955. The heart attack was the fatal result of the alleged accident. See Kraemer v. Jahncke Services, La.App., Orleans, 83 So.2d 916.
"Although compensation was denied in the cited case, the Court there reviewed the jurisprudence dealing with heart attacks in compensation cases, and, after listing the well recognized causes of compensable heart attacks, such as the aggravation of a pre-existing heart condition by the employee's work, excessive heat, intense hard labor, sudden fright or attack, added:
"`or any other stress that might aggravate such condition and cause disability or death would be compensable under the Workmen's Compensation Law.'
"`Later in the opinion the Court refers more than once to mental as well as physical stress and strain.
"`In view of these authorities and the conclusive testimony of Dr. Witter, it is my opinion the evidence here shows the occurrence of an accident in the comtemplation of the statute.
"`As to whether the accident arose out of and in the course of decedent's employment, we find in Professor Malone's work, Section 162, the following:
"`As indicated previously, the terms arising out of, and in the course of are not synonymous. The former suggests an inquiry into the character or origin of the risk, while the latter brings into focus the time and place relationship between the risk and the employment.'
"The section then follows with clear examples falling under the two phrases, but none of these examples is particularly helpful here. Although the jurisprudence clearly shows there are two separate questions involved, it is difficult to entirely separate them for purposes of consideration in the instant case. However, if the two questions are separated, it appears beyond dispute that the accident here arose in the course of decedent's employment. Regardless of the hour at which decedent received the chief's letter, and regardless of whether he was actually on duty at the time, the letter was an official communication from a superior officer to one of his subordinates, dealing directly with the latter's employment. He received it as an employee, and its receipt was not something which occurred while he was engaged in his private affairs or for his personal pleasure.
"There are numerous cases in our jurisprudence dealing with the question of whether the accident on which the claim is based arose out of the claimant's employment. The writer has examined many of these cases but has failed to find any expression in them which may be satisfactorily applied to the facts in the instant case.
"It goes without saying that it was the duty of decedent as a member of the police department to receive orders, instructions, and other communications *483 from his superior officers. These communications no doubt dealt principally with decedent's routine duties as a police captain. Others dealt with special assignments. Some were doubtless given in writing, and some were given orally. Some were given to decedent individually, and some were general in their nature, that is, they were directed to all police captains or to all officers in the department. If, as a result of one of these orders or communications, decedent had suffered a fatal heart attack, the fact that the accident arose out of his employment could not be questioned. The communication here involved is admittedly not one of the usual orders referred to above. However, the conclusion is inescapable that the forwarding of the letter by the chief of police and its receipt by decedent arose out of decedent's employment. The letter sought to terminate the employment, and except for the employment no such letter would have come into existance.
"The extremely difficult question that might have arisen in this case did not arise. That is the question as to the cause of decedent's fatal heart attack. Similar cases in our jurisprudence have almost without exception been decided on that point. Since the evidence in this case is conclusive on that point the chief difficulty usually facing the court does not appear.
"I am satisfied from the evidence that plaintiff is entitled to recover compensation for the death of her husband.
"Plaintiff has proved medical expenses in the amount of $10. From the evidence she is clearly entitled to recover the $250 maximum for burial expenses and, in my opinion, the additional $50 for contingent expenses in connection therewith.
"For the reasons assigned there is judgment for plaintiff awarding compensation at the rate of $30 per week for 300 weeks, commencing January 21, 1955, with 5% per annum interest on past due payments; and in the further sum of $310 for medical and burial expenses.
"The expert witness fee of Dr. Howard B. Witter is fixed at $50 and taxed as costs."
A reading of the record discloses that the findings of fact above set forth are amply substantiated; however, we cannot agree with the legal conclusions reached by the Lower Court.
Another factor which we think should be taken into consideration in the mental disturbance and unrest of Captain Seals and which was not mentioned by the Lower Court is the following testimony given by Dr. Witter.
"When a man comes into your office, a man you have known for a period of twenty some yearsI have seen him with his face battered up when he has arrested somebody, I have seen him when he was hurt, something of that kind came up, but I never saw Captain Seals the way he was the night he came into my office (this was some three nights before January 17, 1955) he walked in, sat down in a chair, he was shaking like that and crying, and that is the first time in my life I have ever seen Captain Seals cry. And he just sat there and cried like a baby when he told me about this retirement. And what he went on to tell me was, `I have these boys, I want to get them through school.' He said, `If they retire me, that is all.' And that was when I told him if he didn't stop worrying about it, if he didn't do something else, it would kill him. I also talked to Dr. McVea about the same thing after that letter was written. I told Dr. McVea at The Lady of the Lake that it was going to kill Seals.
"Q. Let me ask you this one further question. If Captain Seals had been *484 able to take your advice and had been able to put aside this matter which was worrying him, as I understand it, it would be your feeling from a medical standpoint that he might have avoided this fatal attack? A. Exactly, and that he might have lived a good many years."
There is no question in the court's opinion after studying Dr. Witter's testimony that it was Captain Seals' worry over the possibility of being forced to retire from the police force the thing that resulted in his fatal heart attack.
The mere fact that a workman develops heart disease or coronary thrombosis while employed by another does not necessarily entitle him to compensation. The employer is not the insurer of his employees. There must be an accident to furnish the basis of any such claim, that is to say, something sudden, undesigned or unexpected and that accident must either cause or aggravate the disease which is the cause of the disability and, further, that accident must be caused by or as a result or have some causal connection with the employee performing services arising out of and incidental to his employment in the course of his employer's trade, business or occupation. There is no question that the benefit or retirement disability that Captain Seals was entitled to resulted from his employment by the City of Baton Rouge, but we are of the impression that his retirement or disability benefit was something that was personal to the Captain and that the notice of forced retirement or acceptance of disability benefits and resulting thrombosis had nothing whatsoever to do with the services being performed or to be performed, which he was employed to do, for his employer. It is our impression from the record that the letter hereinabove quoted in full had nothing whatsoever to do with services to be performed by Captain Seals for and on behalf of the City of Baton Rouge, but only had something to do with his retirement and had no connection whatsoever with work to be performed. We are of the opinion that the accident must have some causal connection with the employment, that is to say, with the service being performed or to be performed in the furtherance of the work of the employment or growing out of said employment. It may be well to note in the testimony of Dr. Witter as hereinabove quoted that Captain Seals was very much concerned about the education of his boys and that was in our opinion his chief worry because if they retired him according to his own words, "That is all." Captain Seals wasn't worried about the execution of any work he was doing or order of work to be done, but merely worried about his boys if he was forced to retire. It may be well to note that Captain Seals was on duty in the police department for the City of Baton Rouge for the last time on Friday January 14, 1955. He was on vacation with pay effective Saturday January 15, 1955 and remained on vacation to the date of his death on January 21, 1955. On Monday January 17, 1955 while on vacation Captain Seals had a minor attack and was visited by Dr. Witter. He was again advised to take things easy, not to get excited and remain quiet. Thereafter on January 18, 1955 he went by automobile to Franklinton, Louisiana to visit his father and returned to Baton Rouge on the night of Thursday January 20, 1955 for the avowed purpose of attending a citizens meeting on the night of Friday January 21, 1955 at which a number of citizens were to protest the retirement of Captain Seals and other members of the police department. On Friday January 21, 1955, while still on vacation at his home, Captain Seals suffered a severe coronary attack and was taken to the hospital and there died.
We note according to LSA-R.S. 23:1034 that, "The provisions of this Chapter shall apply to every person in the service of the state or political subdivision thereof, * * *." This section was amended by Act No. 412 of 1950 to cover members of the police department of a municipality who *485 are not elected officials. There is no evidence in this record that Captain Seals was an elected official. We note further according to LSA-R.S. 23:1035, that:
"The provisions of this Chapter shall also apply to every person performing services arising out of and incidental to his employment in the course of his employer's trade, business, or occupation * * *;"
As stated by Professor Malone in his work (Louisiana Workmen's Compensation Law and Practice, Section 161):
"The task of deciding which risk shall be included within the act and which shall be excluded is one which must be undertaken by the courts with only a minimum of legislative assistance. Only the spare phrases, arising out of the employment, and in the course of the employment, have been provided in the act. The substance must be filled in from the courts on notions of fair play between employer and employee."
A discussion of the various cases cited by counsel for plaintiff would serve no useful purpose for, suffice it to say, none of them present a situation where the relationship of time, place and manner of occurrence of the accident and death and the employment are so remote as in the case at bar. It is our impression and opinion nevertheless in view of LSA-R.S. 23:1034, 23:1035 for the plaintiff here to be entitled to compensation that the accident must have occurred while the employee was performing some form of service arising out of and incidental to his employment as well as in the course of his employer's business or occupation. We do not mean to say that it is absolutely necessary that the employee be engaged at the time of the injury in activity of benefit to his employer, but we are of the opinion that the accident and resulting disability or death must have some causal connection with the services arising out of and incidental to the employment. We are of the opinion that this is absent in the instant case. We are not unmindful of the humanitarian aims behind our Compensation Statute and the liberal manner in which it should be construed. To allow recovery in this case, however, would, we believe, stretch the meaning of the phrases "performing services, arising out of and incidental to his employment in the course of his employer's trade, business or occupation" far beyond the intent with which they were enacted. This case presents, as we see it, merely a situation where a person was being retired in accordance with normal practices. We do not think that death caused from agitation over retirement and occurring while on vacation either arises from performing services out of and incidental to his employment or in the course of his employer's trade, business or occupation. If we followed plaintiff's contention and theory in this case, every employer in this state would be in a quandry and stalemate as to the discharge or forced retirement of any of its employees who it may know or not know of having coronary complications. If the employer was forced to discharge an employee due to economic reasons, said discharge may cause mental worry and agitation, and as a result, cause coronary thrombosis. The same is likewise true with reference to informing an employee of his forced retirement or for his disability retirement. In either event, if, as a result of the discharge or notice to the employee of forced retirement or disability retirement (such as what took place in the case at bar), the employee develops a thrombosis and dies as a result, the employer would be liable for compensation. We do not believe the legislature ever intended that situation to exist.
For the reasons assigned the judgment appealed from is reversed and plaintiff's suit dismissed at her costs.
Judgment reversed.