JOHNSON, Judge.
The plaintiff has appealed from a judgment of the Civil District Court of Orleans Parish dismissing plaintiffs’ suit for maximum workmen’s compensation and medical expenses.
For many years Mente & Company was a corporation domiciled in New Orleans and engaged in manufacturing textile bags of various kinds. It had offices and factories in New Orleans and other cities. Some ninety per cent of its voting stock was owned by Isaac Rhea and Posey Rhea, husband and wife. Mr. Rhea was the president and principal owner of the business and, until he got sick in 1938, he was in active management of it. He, Mrs. Rhea and Harold Danziger, the plaintiff herein, were the board of directors. Mr. Danziger was vice-president in charge of sales. About 1938 Mr. Rhea became ill and unable thereafter to exercise his duties with the company. He and Mrs. Rhea took up residence in Asheville, North Carolina, until they moved to Memphis in 1949. They never returned to New Orleans. Mr. *683 Danziger, the plaintiff herein, took over the entire management of the business in addition to his duties as head of the sales department. Danziger had been with the company some forty years.
Mr. Rhea’s death was expected at any time, but Mrs. Rhea’s death was not expected. On September 4, 1952, at about 1:30 o’clock a. m., Mr. Danziger was asleep in bed at his home when he received a telephone call from Mr. Rhea’s sister informing Danziger that Mrs. Rhea had unexpectedly and suddenly passed away in Memphis. Mr. Danziger then started making arrangements to go to Memphis with several other employees. He called various employees to tell them of Mrs. Rhea’s death and instructed them in regard to their duties at the factory. He called a conference of key personnel for later that morning to arrange for continued operation of the business in his absence. He called his secretary, Mrs. Mahen, informed her of Mrs. Rhea’s death and asked her to make plane reservations for four or five persons to go to Memphis and instructed her to call him when she had done so. Mrs. Mahen testified that after trying for about an hour, she could get no answer on the telephone at the airport and she called Mr. Danziger to inform him. She said that when she was talking to Mr. Danziger on that occasion she heard a peculiar noise and could get no further response from him. Mrs. Falk, Danziger’s sister, picked up the telephone and told Mrs. Mahen that something had happened to Mr. Danziger.
Mrs. Falk and her sister, Miss Edna Danziger, lived with plaintiff, who was not married. The sisters testified that after receiving the news of Mrs. Rhea’s death he became excited, shaky and nervous and seemed to go all to pieces. They got him to bed and gave him some ammonia to calm him. He went on phoning various members of his staff. He soon got up and while talking on the phone to Mrs. Mahen, he suddenly made a mumbling sound as if he were trying to speak but couldn’t. He became unsteady and dropped the phone. The two sisters caught him-to prevent his falling and got him to the-bed. One of them talked to Mrs. Mahen- and explained what had happened and then-called the doctor who lived in the neighborhood. The doctor came right over in> his pajamas and sent Mr. Danziger to the-hospital .in an ambulance.
Mr. Danziger suffered a paralytic stroke with loss of speech and paralysis in the right arm and right leg. After a stay in the hospital he recovered some use of his limbs to the extent that he could walk with difficulty but never recovered ability to speak. He had another bad attack in 1956. He died on August 24, 1957. This suit was filed by him on May 28, 1954. After his death his sisters, Edna Gertrude Danziger and Miriam Danziger Falk, qualified as testamentary executrixes and they were substituted herein as parties plaintiff. The substituted plaintiffs amended the petition to claim for the estate compensation up to date of Danziger’s death, 258 weeks less credit of 37 weeks during which'compensation had been paid before his death. The suit was tried on the merits on October 28, 1958.
On December 8, 1958, the Court rendered judgment in favor of defendants, dismissing the suit. The judgment was signed on December 12, 1958. We quote the Court’s reasons embodied in the judgment, as follows:
“This matter having been heretofore submitted to the Court for adjudication, and when, after considering the-pleadings, evidence and argument of counsel, and the Court being of the opinion that no accident occurred within the contemplation of the Workmen’s Compensation Act, and, if there was an accident, which is not admitted, then it did not occur within the course and scope of the late Harold Danzi-.ger’s employment, for the reasons assigned * *
This suit is grounded on the theory that the news of the death of Mrs. Rhea coupled *684 with Mr. Danziger’s activity immediately following the receipt of such news, constituted an accident resulting in total permanent disability. “Accident” as defined by LSA-R.S. 23:1021 is “An unexpected or unforeseen event happening suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury.”
LSA-R.S. 23:1035 says that the provisions of the Workmen’s Compensation Law shall apply to persons injured or disabled while performing “services arising out of and incidental to his employment in the course of his employer’s trade, business or occupation * * Therefore, we must first determine whether the receipt of the information of Mrs. Rhea’s unexpected and sudden death and the events which followed immediately amounted to an accident which happened while Mr. Dan-ziger was performing services arising out of and incidental to his employment in the course of his employer’s trade, business or occupation. If so, then we must look to the medical testimony to decide whether such an accident was the cause of Mr. Danziger’s disability.
The business of Mente & Company was to manufacture and sell bags. Mr. Dan-ziger’s duties, as sales manager and general superintendent of the business, involved the usual types of transactions, activities and decisions. The volume of business of that company at its New Orleans factory alone amounted to about three-quarters of a million dollars a month. He managed two other factories in other cities. There can be no doubt that Mr. Danziger was kept quite busy. His base salary was $1,750.00 a month. That, plus a bonus for year ending August 1, 1952, brought his total pay for that year up to $27,000.00.
Mr. M. L. Harper, assistant treasurer, testified that Mrs. Rhea was active in the management of the business to the extent that she and Mr. Danziger conferred on company business by long distance telephone two or three times a week.
It is easy to understand that the unexpected death of Mrs. Rhea was a grievous shock to Mr. Danziger. He was a trusted employee of long standing. He was the head of the business. He was wholly responsible for its success or failure. Mr. and Mrs. Rhea owned the corporation and it is understood that their money financed it. The testimony shows that Mr. Rhea had been completely incapacitated for some years and was on his deathbed in a Memphis hospital at the time. Therefore, there cannot be the slightest doubt that it was Danziger’s duty to receive immediate notice of Mrs. Rhea’s unexpected death and that such duty arose out of and was incidental to his employment in the course of his employer’s business. To hold otherwise would be entirely out of keeping with what we believe to be accepted notions of fitness and decency. The suggestion is made that Danziger and the Rheas were social friends as well as business associates and the early morning events at the Danziger home on that occasion were personal to Mr. Danziger; that his excitement and agitation resulted from a personal concern about his job and the jobs of some 250 fellow-employees and about the future stability of the company. Personal considerations no doubt played a part. That possibility is given credence only by innuendo'. What Mr. Danziger did and said in the hour immediately following his receipt of the news of Mrs. Rhea’s death are explained by his sisters, Mrs. Mahen and Mr. Harper, references to which we have made above. So far as the evidence enlightens us, there was not one word spoken to indicate any concern about his future personal welfare, unless his statement to Mrs. Mahen that they were really “in a mess,” had that import.
In his argument counsel for defendant conceded the hazardous nature of Mente & Company and of Mr. Danziger’s duties. Mr. Harper testified that Mente & Com *685 pany manufactured textile bags, imported burlap, processed secondhand bags with side lines of mildew-proofing, laminating and other things. The factory covered S city blocks operating many kinds of high-speed machines, hydraulic rolling presses, steam cylinders and many types of motors and equipment. He said that Mr. Danzi-ger’s duties as general superintendent and manager made it necessary that he go into the factory amongst and around the machines every day.
Also, Mr. Harper, Mrs. Mahen, who was office secretary, and whose services with the company extended about 40 years, and Mr. Danziger’s sisters testified that he was on duty and subject to call around the clock at all times and wherever he might be. The sisters said that he was quite often called at night and that he never left home without giving them information as to where he could be reached. Even when he was on vacation at his summer home on the gulf coast he was constantly in touch with fellow-employees on company business. Therefore, his employment and services were not confined to the company premises or to the traditional 8 hours per day, but he was on duty and call 24 hours each day, 7 days a week.
Judge McBride, of this Court, was author of a full discussion of such a situation in the case of Rosenquist v. New Amsterdam Casualty Company, La.App., 78 So.2d 225. In that case the plaintiff was an employee of Maison Blanche as a combination saleslady and beauty operator on board a seagoing ship owned and operated by the Mississippi Shipping Company, carrying freight and passengers between New Orleans and South America. Maison Blanche held a concession to sell its merchandise and operate a beauty parlor on board the vessel and plaintiff was in charge of that concession. At 3:00 o’clock p. m., while the ship was at sea enroute from South America to New Orleans, plaintiff was dressed in a bathing suit reclining on a pad on the deck. The ship was rolling and a salt spray had made the surface of the deck wet and slick. She attempted to rise from her recumbent position when the roll of the ship caused her to slip and fall, causing injuries for which she filed suit against her employer’s compensation insurer. Plaintiff in that suit had no regular hours of work but was on duty and subject to call at all times whenever passengers desired her services, even in the night time after her shop had closed. The defendant in that case raised several defenses, the only one of which concerns us here is that she was not acting within the scope of her employment when the accident occurred and that the accident did not arise out of or in the course of her employment. There was judgment for the plaintiff and on the appeal the judgment was affirmed by this Court.
The decision in that case cited Kern v. Southport Mill, 174 La. 432, 141 So. 19, which held that a pipe fitter who had been directed to do some work away from his employer’s premises was performing services arising out of and incidental to his employment in the course of his employer’s trade, business or occupation, when he was struck by an automobile as he stepped off a street car when returning to employer’s place of business after his assigned job was completed. We quote the following from the Kern decision:
“Now an accident occurs in the course of an employment when it takes place during the time of such employment; just as a happening occurs in the course of any given day when it takes place during that day. Hence the provision that the accident, to entitle the employee to compensation, must occur in the course of his employment, means nothing more than that it must have taken place during the hours of employment and not at any other time.
******
“But that alone is not enough for recovery; the statute further requires that the accident must also ‘arise out’ of the employment. By which is meant *686 that the accident must he the result of some risk to which the employee is subjected in the course of his employment and to which he would not have been subjected had he not been so employed.”
Judge McBride cited and discussed the following pertinent cases: Prevost v. Gheens Realty Co., 151 La. 508, 92 So. 38; Primus v. C. C. Hartwell Co., Orleans Appeals, No. 9172; Lagrone v. McIntyre Lumber Co., 1 La.App. 564; St. Alexandre v. Texas Co., La.App., 28 So.2d 385.
Therefore, Mr. Danziger, by virtue of his position, was on duty at all times and at all places which subjected him in the course of his employment to any duty that would properly be imposed upon him as such employee of Mente & Company. If he had not been in that position there would have been no necessity for him to be called from his sleep at home to be informed of the death of Mrs. Rhea and there would have been no occasion for him to become exercised in the process of issuing instructions to other employees of the company and making the necessary arrangements to keep the business in operation during his absence.
Counsel for defendants likens this case to the facts in the Seals v. City of Baton Rouge, La.App., 94 So.2d 478. But actually there is no analogy. Seals was a captain of detectives on the police force in Baton Rouge. On January 3, 1955, the chief of police wrote Captain Seals a letter stating in effect that because of the results of a physical examination it was recommended that the captain retire from his job in accordance with the regulations of the Municipal Fire and Police Civil Service Board that all members of the police force must be physically fit. According to the testimony in that case, Captain Seals worried a great deal about the request to retire and the effect of the emotional strain on him caused him to see his doctor about it. The doctor testified that the captain’s chief worry stemmed from the probability that he would not be able to send his children to college on the reduced pay which he would draw in retirement. The doctor testified that because of this worry and agitation, brought on by the letter, he felt that Captain Seals’ bad heart condition would kill him and he told Captain Seals to go away and do something to take his mind off the subject. Seals took a leave of absence from the force and left the city on January 15th. While still on vacation, on January 21st, Seals suffered a fatal heart attack and his widow brought suit for compensation. The doctor testified in that case that the letter from the chief of police and the worry over his forced retirement brought on the fatal heart attack. The Court held that there was no accident under the terms of the compensation law incidental to his employment in the course of his service as a policeman and that the emotional stress which precipitated the heart attack was something personal to the captain and had nothing to do with his services performed for and on behalf of the City of Baton Rouge as a policeman. We quote the following statements from the opinion in the Seals case at page 485 of 94 So.2d:
“ * * * We do not mean to say that it is absolutely necessary that the employee be engaged at the time of the injury in activity of benefit to his employer, but we are of the opinion that the accident and resulting disability or death must have some causal connection with the services arising out of and incidental to the employment. We are of the opinion that this is absent in the instant case. * * * We do not think that death caused from agitation over retirement and occurring while on vacation either arises from performing services out of and incidental to his employment or in the course of his employer’s trade, business or occupation. * * * ”
Counsel for defendants also refers to Kraemer v. Jahncke Services, La.App., 83 So.2d 916, where Kraemer operated a crane by moving some levers. That plaintiff had been having chest pains and shortness of breath. He had an attack of pain about *687 3:30 p. m., while operating the crane. He rested a few minutes and continued his work. He later attended to some minor superintending duties and at 5:30 went to the dressing room to wash up and change clothes. He there had another attack of coronary thrombosis and died almost instantly. That plaintiff had been operating the crane for five years and his duties were no different on the day of this attack from any other day. His work did not entail physical labor. In denying compensation, this Court adopted the reasons of the District Judge in accordance with this paragraph :
“From the established jurisprudence a rule can be formulated that an accident must either cause or aggravate a pre-existent heart ailment before recovery can be had, and the aggravation must be due to some stress or strain, physical or mental, primarily suffered by the employee while performing his work due to expessive labor, fright, trauma, or any other cause that could aggravate the pre-existing condition; nor is it necessary that there be any great amount of physical strain or unusual exertion in the performance of the duties. It is only necessary that sufficient mental or physical strain occur during the performance of the duties, whether it be heart trouble or any other organic ailment. Nor is it necessary that the result of such stress or strain develop at the time or at the scene of employment if the stress and strain were sufficient to have caused the aggravation ultimately resulting in disability or death. The proof, of course, of the causal connection always rests with the plaintiff.”
Having concluded that the receipt of bad news, coupled with plaintiff’s activity in notifying other employees, rushing arrangements to keep the plant operating in his absence, there is a definite causal connection with the services arising out of and incidental to Danziger’s employment in the course of his employer’s trade, business or occupation, and at the time when he was on duty and subject to call to the same extent as if the incidents referred to took place while he was physically on the property and premises of his employer, we now come to the determination of whether such incidents were sufficient to have caused the illness resulting in Danziger’s disability.
Plaintiff’s medical testimony is given by Dr. Manuel Gardberg, a specialist in internal medicine, who had been Mr. Danziger’s personal physician since 1941, and by Dr. Schenthal, also specializing in internal medicine, who did not treat the plaintiff but who reviewed his hospital and personal records and testified as an expert on the subject.
Dr. Gardberg first saw Mr. Danziger in 1941 when he had a coronary thrombosis, from which he completely recovered without any further difficulty. Since that time Dr. Gardberg has seen this plaintiff two or three times a year making routine physical check-ups and treated him for such ailments as flu and other minor things. Dr. Gard-berg was called to the Danziger home within a few minutes after Mr. Danziger dropped the telephone while talking with Mrs. Mahen. The doctor from that day was in constant touch with him except for the few months in 1957 when Mr. Danziger was sent to the Veteran’s Hospital after the fatal stroke in 1956. Following the incident at the Danziger home, when the doctor got to the hospital he diagnosed the trouble as a cerebral thrombosis or embolism. Mr. Dan-ziger never recovered his ability to speak and could not carry on a conversation. Dr. Gardberg is positive in his opinion that the attack on the night of September 4, 1952, was precipitated by the emotional upset after getting the news of Mrs. Rhea’s death over the telephone; that the stroke caused an embolism or clot that landed in the brain. The doctor explained that there is no way to determine, without an autopsy, what type of clot caused the occlusion of the cerebral blood vessel. He explained that a clot may form in one place and be transported through the blood vessel to the spot *688 in the brain where the damage is caused. In such a case the formation of the clot may proceed over a period of time and the emotional stress and strain coming on with sudden shock in the middle of the night, upon a person being awakened from his sleep, would precipitate the movement of the clot to the point of occlusion, or the incidents may precipitate the formation of the embolism at the spot where the occlusion occurs and the damage is done. The doctor said that in medical circles everywhere that opinion is pretty generally accepted, though there are some who dispute it.
The testimony of Dr. Gardberg was perpetuated in a deposition taken some months before the trial of the case. Dr. Schenthal testified at the trial after reading Dr. Gard-berg’s testimony and after examining the medical and hospital records of Mr. Dan-ziger. He goes into more detail in explaining his opinion as to the cause of plaintiff’s attack, all of which is in complete agreement with Dr. Gardberg’s testimony. Both doctors say that not all the factors involved in precipitation of a thrombosis are known, but that it was clear on the basis of experience that one of the most important single factors is an emotional upset and that this would apply to both cerebral and coronary thromboses. They also say that an emotional was a greater and more frequent factor than a physical strain.
Defendants’ medical testimony was given by Dr. Colclough, a neuro-surgeon. This doctor did not see the patient but like Dr. Schenthal he examined the facts and the medical records in the case. Dr. Colclough said that it was his opinion that the actual thrombosis occurred at least 12 hours prior to the presentation of the symptoms and that the processes leading up to the formation of the thrombosis probably antedated its manifestations by'72 hours. But the theory and explanation given by Doctors Gardberg and Schenthal are more understandable to this layman. They say that in the event the formation of the embolism did commence before Mr. Danziger received the telephone news which upset him, the emotional upset and mental stress and strain following, it could well have precipitated and accelerated the actual breaking off of the clot and the transportation of it in the vessel to the brain.
Dr. Colclough was asked whether the emotional excitement of Mr. Danziger produced by disturbing news or by the mental stress of an argument would agitate a prior arteriosclerotic heart disease so as to produce a cerebral vascular accident. This doctor answered in the affirmative but stated that he thought it would not cause a thrombosis but an embolism. As we understand Dr. Gardberg’s testimony the embolism is the breaking off of the clot after it is formed at some point in the vessel and that the clot may be transported in the vessel to the brain in a matter of seconds where the occlusion takes place.
All in all, it is our conclusion that the preponderance of the medical evidence is that the circumstances prevailing at the time and immediately after Mr. Danziger received the news of the death of one of the officers of his company precipitated the attack which disabled him and from which he never recovered.
Mr. Harper and Mrs. Mahen testified that Mr. Rhea died on October 4, 1952 and that about April 1953 his heirs who succeeded to the ownership of the corporate stock closed the plant and liquidated the business, though there is no official document in the record legally proving such facts. Therefore, judgment will be rendered in accordance with the prayer as against both defendants. Claim is made for medical expenses of $1,000.00. The only proof on the subject is the testimony of Dr. Gardberg that his fees amounted to more than $1,000.-00 and they had been paid, though he could not give the exact amount.
Mr. Danziger had this attack on September 4, 1952. He died on August 24, 1957, which was a period of 4 years 11 months and 20 days, or a total of 258 weeks. The petition alleges that compensation had been paid for a period of 37 weeks at $30.00 *689 per week, the maximum amount provided bylaw as of that time. 258 weeks at $30.00 per week amounts to $7,740.00, to which must be credited the amount paid for the period of 37 weeks or $1,110.00, leaving an unpaid remainder at the time of Mr. Danzi-ger’s death of $6,630.00. The law provides for interest from the maturity of compensation installments. The petition prays for interest only from date of judicial demand, and that will be allowed.
For the reasons given herein, the judgment of the District Court appealed from is reversed and set aside and it is now ordered, adjudged and decreed that there be judgment in favor of the plaintiffs, Edna Gertrude Danziger and Miriam Danziger Falk, testamentary executrixes of the estate of Harold Danziger, deceased, and against Employers Mutual Liability Insurance Co., of Wisconsin and Mente & Company, Inc., individually and in solido in the full sum of $7,630.00, together with legal interest from date of judicial demand until paid and for all costs of this suit.
Reversed and rendered.