REID, Judge.
Plaintiff, Clyde E. Jarvis, brought this suit for permanent and total disability under the Workmen’s Compensation Act as a result of an alleged injury which he claims happened on or about August 10, 1963 while working as a cement finisher at St. Francis-ville, Louisiana, in the joint employ of Wright Contracting Company and Wey-mouth Construction Company, and that his employment was hazardous. His average weekly earnings were such that 65% thereof would exceed $35.00 per week.
The injury alleged to have been received by plaintiff was that he was caused to work most of the day walking in deep water, and the water had become permeated with chemical components of the cement as a result of which the toes on his left foot became infected.
He seeks judgment in the amount of $35.00 per week for a period not to exceed 400 weeks; for medical expenses to the limits provided by defendant’s policy, although he alleges that so far his medical expenses total $1473.00 and asks for penalties of 12% and reasonable attorneys fees, and costs.
Defendant filed an answer denying the allegation of any injury, but admitted that *748 it paid some of the medical expenses and that it had paid plaintiff $35.00 per week during a period of 27 weeks, beginning on August 11, 1963 and ending on February-15, 1964. The remaining allegations were denied although it did admit discontinuing the payment of the weekly compensation benefits.
The case was tried and the Judge of the Lower- Court with written reasons handed down rendered judgment in favor of the defendant, rejecting plaintiff’s demands and dismissing the suit at plaintiff’s costs.
From this judgment plaintiff herein has appealed devolutively.
The facts show that the plaintiff was employed as a mat finisher in the process of making concrete revetment mats used by the U. S. Engineers in the Mississippi River. His job as a cement finisher consisted of smoothing out rough places and then connecting wires after the concrete had been poured into the mat forms. The mats were constructed in an open field situated along the river where the land was low. There is no question but what in the case of rain the water would sometimes make puddles and the contractors would have the laborers, including plaintiff, cover the poured mats with tarpaulins and that the laborers would be required to finish all mats that had been poured in the mat field before quitting for the day.
Plaintiff testified that on or about August 10, 1963, he thinks on a Thursday, which would be August 8th, there was a hard rain flooding the area where he was working and after spreading the tarpaulin he continued to work finishing the mats for some four hours before he quit for the day, and that he had to walk in water which he claims sometimes was from one foot to eighteen inches deep. He claims further that there was a solution of chloride poured into the cement to make it set quicker, and that the rain washed some of this chloride into the water on the ground.
He claimed that late in the evening when he knocked off work around six or six thirty and went home, he took off his shoes and socks and found that his feet were red and hurting. He testified that there were no burns or cuts or bruises of any kind to show any trauma on the toes. The toes on both feet were red but the toe that gave him the most trouble was the middle toe on his left foot. There was no work the next day but he returned to work on Saturday, but his feet continued to bother him and he spent most of the forenoon sitting in the back of a pickup truck. He did not report for work on Monday but went to see Dr. Charles Catchings, a doctor in Woodville, Mississippi, near where he lived. Dr. Catchings on his examination of the plaintiff on August 12, 1963 found the toe ulcerated on the third distal or the very tip of the toe. He treated the toe with boric acid, washing it in boric acid, and giving him shots of antibiotics.
The toe did not improve and on August 26, 1963 plaintiff reported the incidence to his employer who referred him to Dr. A. R. Gould, a physician in St. Francisville. Dr. Gould treated him, but did not get any satisfactory results and on September 31, 1963 he referred him to Dr. R. J. Field Jr., in Centerville, Mississippi who performed two operations on his toe, finally amputating it. Still the wound did not heal. Dr. Field’s diagnosis was that circulatory insufficiency in Jarvis’ left leg was the reason for this. He referred plaintiff to the Veterans Administration Hospital in New Orleans and the doctor there, Dr. Salem F. Sayegh, found that Jarvis was suffering from a block in the common iliac artery. They performed an endarterectomy on or about October 23, 1963. This operation was considered successful and the wound healed. However, on July 15, 1964 another minor operation was performed to improve the remaining vascular difficulties. Since that time plaintiff has not returned to any work and claims that he suffers pain or “charley horses” in the left calf after walking a distance of approximately three blocks.
*749 There is no question but what plaintiff had an arterial insufficiency or a compromised blood supply to his left leg, which predated the alleged injury on August 8th. There are two questions to be determined herein, first, whether this was a case of primary gangrene, namely an infection caused by decayed tissue due to insufficient blood supply or whether it was an infection arising independently of the insufficient blood supply causing aggravation thereof to precipitate the above course of events, which would be denominated secondary gangrene.
If it was found to be secondary gangrene, then was infection caused by plaintiff’s employment, and if so, does said infection fall within the purview of Louisiana Workmen’s Compensation Law ?
Dr. A. R. Gould testified that there were three factors involved in infection to plaintiff’s foot. Number one, impairment to the circulation of the foot even though pulses were felt in the foot. One doctor testified that he felt pulses in there when he first examined him, but Dr. Catchings failed to find any pulse. He testified that there was an impairment to the circulation of the blood prior to the time of the injury but he could not determine the degree of that impairment.
The second contributing factor would be the amount of hygiene that would be directed toward the foot in terms of the frequency of the cleansing of the foot, the materials used to clean the foot, the cleanliness of the covering of the foot, that is, the shoe and sock that went on it, and the matter of foreign matter that was allowed to be present on the skin of the foot, or near the skin, would be another contributing factor.
The third factor would be water, and that means water and not water in which chemicals have been injected.
Dr. Gould further testified that he thought the percentage of these contributing factors was about equal, or one-third each. He felt like that the gangrene was secondary gangrene but did not rule out the possibility of primary gangrene.
It was testified by two of the doctors that the loss of a toe, unless it was the big toe, would not impair the use of the foot and would not interfere with a man going about his ordinary labor.
The defendant put on the Stand Mr. Jeff Collins who is chief engineer of the U. S. Department of Engineers. He testified that according to his records the rains did not start until 4:30 that afternoon. He testified that it was calcium chlorine that was injected, or mixed, with the cement and that the percentage of calcium chlorine was only 2%. He further testified that the puddles were not more than two or three inches deep and that only a small portion of the cement mix washed off over into the water.
There is testimony in the record by several doctors that some forms of calcium chloride or chlorine are used as germicides or disinfectants.
This Court feels that plaintiff failed to prove any trauma which could have caused plaintiff’s condition, or aggravate a preexisting condition. The testimony is divided as to whether there was a primary or secondary gangrene, but all the doctors agreed that an insufficient circulation of the blood was a large contributing factor to the plaintiff’s injuries.
Assuming for the sake of argument that it would be considered as secondary gangrene then we are now going to go into the proposition as to whether it is com-pensable under the Workmen’s Compensation Law.
Plaintiff appellant cited several cases in support of his contention that when plaintiff had to walk for four hours through water which contained overflow cement which in turn had been mixed with calcium chloride was a trauma. We have no quarrel with these cases but do not think that they fit the case in point. In one case, *750 Johnson v. Zurich General Accident and Liability Insurance Company, La.App., 161 So. 667, the Court held merely that while there was no physical contact, the act of pranksters taking into custody the watchman employed by the employer, and causing a heart attack was sufficient to bring it within the purview of the Act. There are several cases cited where there were preexisting conditions such as heart attacks and so forth, which were aggravated or accelerated by some incident.
In Vidrine v. New Amsterdam Casualty Company, La.App., 137 So.2d 666 the Court found that there was a causal relation because the plaintiff’s condition became aggravated and disabling while performing very strenuous work in inclement weather. This was an incident of his work and natural development from it.
In Cutno v. Neeb Kearney & Company, 237 La. 828, 112 So.2d 628 the claimant after a hard day’s work suffered a perforation of a duodenal ulcer. The Court allowed recovery because it found that the strenuous work constituted an accident under his condition.
The appellee relies on two cases, namely, Stuckey v. City of Alexandria, La.App., 81 So.2d 46, and Danziger v. Employers Liability Insurance Company, 245 La. 33, 156 So.2d 468.
The case of Stuckey v. City of Alexandria, supra, holds as follows:
“Appellant earnestly urges that psittacosis as contracted by the employee was an accident and as such should be compensated under the Act. The medical testimony adduced from the trial uniformly established psittacosis is an infectious disease and was contracted by Stuckey through the mouth or nose, which is the normal method of communication. According to Stuckey’s testimony, the onset of the disease was not acute for he felt its effects approximately a month before he considered it necessary to consult a physician. No evidence was adduced to show that the disease was contracted through a scratch,, bruise or other injury or violence to the physical structure of the body.
The Workmen’s Compensation Act expressly restricts payment of compensation to an employee who receives, injury by accident arising out of and. in the course of his employment. The Act has been amended by Act No. 532" of 1952, LSA-R.S. 23:1031.1, to allow-recovery under employment disabilities, caused by diseases as named and classified therein. The word ‘accident’ as used in the statute is defined as. ‘an unexpected or unforeseen event, happening suddenly or violently, with or without human fault and producing-at the time objective symptoms of injury.’ LSA-R.S. 23:1021(1). ‘Injury’ and ‘Personal Injuries’ are defined to include ‘only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom’, and the statute provides: ‘These terms shall' in no case be construed to include any other form of disease or derangement, howsoever caused or contracted.” . L SA-R.S. 23:1021(7). ‘Accident’ and ‘Personal Injury’ have been construed by the courts to include skin poisoning, eye injury from dirt particles, glare from blow torches, heart attacks, or other disabilities resulting from excessive heat, physical exertion, and inhalation of dirt particles. In all of these cases the award of compensation was granted upon a finding the disability resulted from unexpected or unforeseen events which happened suddenly and violently and caused at least some injury to the physical structure of the-body. In the statutory definition of ‘Injury’ and ‘Personal Injury’ as recited above, diseases or infections which' naturally result from injuries produced: by violence to. the physical structure-. *751 of the body are expressly covered by the Act.”
We believe that Danziger v. Employers Mutual and Liability Insurance Company of Wisconsin, supra, is an even stronger case. In this case the plaintiff was a white collar worker and suffered an emotional shock upon receiving news of a Mrs. Rhea’s death, coupled with his activity in notifying other employees and rushing arrangements to keep the plant operating during his absence precipitated a disabling heart attack of cerebral thrombosis which plaintiff claimed was an accident. The District Court decided in favor of the defendant, but the Court of Appeal, Fourth Circuit, 146 So.2d 682, reversed the District Court and held for the plaintiff. The Supreme Court in this case reversed the Court of Appeal in the following language, to-wit:
“A careful consideration of this matter has convinced us that the Court of Appeal erred in holding that the cerebral thrombosis suffered by Mr. Dan-ziger was an ‘injury’ or that the emotional shock, which allegedly caused the stroke, was an ‘accident’ within the intendment of our Employers’ Liability Statute. Hence, it is not of importance to our decision that we determine whether the so-called ‘accident’ occurred during the course of Mr. Dan-ziger’s employment and that it had causal connection with and arose out of the employment. For purposes of this discussion it will be assumed that such is the case.
The sections of the Employers’ Liability. Act pertinent here are LSA-R.S. 23:1021 and LSA-R.S. 23:1031. The latter provides in part:
‘If an employee not otherwise eliminated from the benefits of this Chapter, receives personal injury by accident arising out of and in the course of his employment, his employer shall pay compensation in the amounts, on the conditions, and to the person or persons hereinafter designated.’ (Italics ours.)
(1) Thus, in order for an employee to be entitled to compensation, he must receive a personal injury as the result of an accident. What, then, is an ‘accident’ and ‘personal injury’ within the purview of the statute?
Paragraph (1) of R.S. 23:1021 defines ‘accident’ as follows:
‘(1) “Accident” means an unexpected or unforseen event happening suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury.’ (Italics ours.)
Accordingly, if we assume that the news of Mrs. Rhea’s death and the immediate activity of Mr. Danziger in connection therewith constituted an unexpected event which happened suddenly, it still cannot be regarded as an accident unless it produced at the time ‘objective symptoms of an injury’. To ascertain whether a compensable injury was produced, we must examine paragraph (7) of R.S. 23:1021, which defines ‘injury’ as follows:
‘(7) “Injury” and “Personal Injuries” includes only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom. These terms shall in no case be construed to include any other form of disease or derangement, howsoever caused or contracted.’ (Italics ours.)
(2, 3) This provision -is clear and explicit; hence it needs no interpretation. In restricting by definition com-pensable injuries to those affecting the physical structure of the body, it (paragraph 7) necessarily narrows the scope of the statute to traumatic physical hurts, evidence of which must appear in order for the event to be classified as an ‘accident’ as defined by paragraph (1) of R.S. 23:1021. Conse *752 quently, then, the law of this State does not provide for the payment of compensation for disabling diseases resulting from emotion or psychic trauma upon which the claim in this case is founded. For, while compensation for diseases suffered by an employee is recognized as compensable under our law, recovery is limited (save in cases of occupational diseases covered by R.S. 23:1031.1) as provided by paragraph (7) of R.S. 23:1021, to those diseases or infections which ‘naturally result’ from a traumatic physical injury to the body in an accident arising out of and in the course of the employment.”
We are, therefore, of the opinion that the plaintiff has failed to carry the burden of proving his case by a preponderance of evidence, and the judgment of the Lower Court is hereby affirmed.
Affirmed.